NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ANTONIO LORENZO-NODA, | Civil Action No. 18-13414-AME |
| Plaintiff, | |
| v. | FINDINGS OF FACT AND CONCLUSIONS OF LAW: DAMAGES |
| CARL KAZAK, et al., | |
| Defendants. | |

**ESPINOSA, U.S.M.J.**

**I.   INTRODUCTION**

This action arises out of a May 3, 2017 motor vehicle accident involving a dump truck driven by Plaintiff Antonio Lorenzo-Noda ("Plaintiff") in the course of his employment for non-party H&O Trucking and a tractor trailer driven by Defendant Carl Kazak in the course of his employment for Defendant Armellini Express Lines Inc. (collectively "Defendants"). The non-jury trial of this action was bifurcated into a liability phase and a damages phase. After a trial on liability held on May 21, 2024, the Court entered findings of fact on the record of proceedings and concluded Defendants were 85% at fault for the accident. The damages phase of the trial commenced on December 16, 2024, when Plaintiff testified before the Court. By agreement, the parties thereafter provided expert testimony by way of videotaped *de bene esse* depositions. The parties were afforded a full opportunity to be heard, examine and cross-examine witnesses, submit evidence, and present argument in their respective proposed findings of fact and conclusions of law, filed on May 9, 2025. Having carefully reviewed the evidence and the post-trial written submissions, the Court now issues these findings of fact and conclusions of law as to damages.

## II. FINDINGS OF FACT

1. Plaintiff claims he sustained injuries to his neck, back, right shoulder, and left knee as a result of the May 3, 2017 accident.

2. At the time of the accident, Plaintiff was 62 years old and the sole income provider for his family.

3. Plaintiff testified he was wearing a seatbelt at the time of the accident, but on impact, his body jerked violently. He stated that, at the time of impact, he was projected forward so that his chest struck the steering wheel and his left knee hit the window crank handle on the driver's side door.

4. However, on cross-examination, Plaintiff's account of how he was allegedly injured was impeached with inconsistent deposition testimony, wherein he failed to state that his body had been projected forward or that he had hit his knee during the collision.

5. On the day of the accident, Plaintiff received medical attention at Robert Wood Johnson Hospital's emergency department, where he was diagnosed with neck strain.

6. Thereafter, Plaintiff continued to experience neck pain and developed pain in the other allegedly affected areas of his body. He testified he did not feel pain in these areas before the May 2017 motor vehicle accident.

7. Plaintiff further testified that, since the time of the accident, he has continued to feel pain. He stated the pain affects his daily activities. For example, he has difficulty going up and down the stairs and sleeping. Plaintiff further testified can no longer run or swim like he used to prior to the accident.

8. Although he states he continued to feel pain in the months after the May 2017 accident, Plaintiff did not seek further medical care until August 2017. Based on Plaintiff's testimony, it appears that, at the time, Plaintiff's employer denied it had workers' compensation coverage. Plaintiff nevertheless proceeded to seek treatment without the coverage.

9. In August 2017, Plaintiff began seeing chiropractor Alan Epstein, who ordered MRIs. Plaintiff underwent MRIs of his cervical spine, lumbar spine, right shoulder, and left knee on August 3, 2017.

10. The August 2017 MRI reports contain the following findings:

    a. Cervical disc herniations at C2-C3 and C6-C7, with multiple bulging discs;

    b. Lumbar disc herniation at L3-L4, with bulging discs at other levels;

    c. Right shoulder partial rotator cuff tear; and

    d. Left knee medial meniscal tear.

11. Upon Dr. Epstein's referral, Plaintiff saw orthopedist Dr. Steven Nehmer for his shoulder and knee injury on several occasions, beginning in September 2017. Dr. Nehmer conducted a physical examination of those areas and recommended physical therapy. After therapy was unsuccessful in treating Plaintiff's pain, Dr. Nehmer recommended surgery. However, Plaintiff declined further treatment due to concerns about work and related financial issues. Plaintiff last saw Dr. Nehmer in May 2019.

12. Subsequently, Plaintiff's employer acknowledged it did carry workers' compensation insurance, and Plaintiff proceeded to seek treatment under that coverage. He began treatment with orthopedic surgeon Dr. Gregory Gallick in December 2019.

13. During the first visit, Dr. Gallick conducted a physical examination of Plaintiff's left knee and determined there was meniscal damage. In making this diagnosis, Dr. Gallick also reviewed medical records and the MRI studies Plaintiff underwent in August 2017.

14. Dr. Gallick recommended Plaintiff have surgery to repair his left knee medial meniscus tear and performed arthroscopic surgery on Plaintiff, on March 5, 2020.

15. Concerning damages, a main point of dispute between the parties is whether any of the injuries Plaintiff claims he sustained in the May 2017 motor vehicle accident were caused by that accident, that is, by Defendants' negligent conduct.

16. As to causation, Plaintiff offered the testimony of two expert witnesses, Dr. Nehmer and Dr. Gallick. They are both board-certified orthopedic surgeons. They each have over 35 years of experience and continue to practice in their field.

17. Dr. Nehmer opined that Plaintiff's neck, back, shoulder, and knee injuries were caused by the May 2017 accident. Dr. Nehmer based this opinion on Plaintiff's description of the onset of pain after the accident, Dr. Nehmer's review of the August 2017 MRIs, and his physical examination of Plaintiff's shoulder and left knee.

18. However, during his testimony, Dr. Nehmer conceded he had not physically examined Plaintiff's neck and back.

19. Dr. Nehmer further conceded that although Plaintiff had informed him of some details from the accident, Dr. Nehmer's knowledge of the facts was limited. For example, he was not aware of the speed at which Plaintiff's truck was travelling, nor

4

did he inquire whether Plaintiff's left knee sustained any impact or forceful contact in the May 2017 accident.

20. Additionally, Dr. Nehmer admitted that, in reaching his opinion, he did not consider information in Plaintiff's medical history indicating Plaintiff had sought medical attention at Trinitas Hospital following a physical assault he sustained in Feb 2016. Dr. Nehmer did not consider Plaintiff's complaints of a head and neck injury at that time or the CT scan of Plaintiff's cervical spine taken at that time. Nor did Dr. Nehmer consider that, as recorded in his medical history, Plaintiff continued to complain of neck pain and stiffness in November 2016. Finally, Dr. Nehmer failed to consider that, according to the CT scan performed on the day of the May 2017 accident, Plaintiff's cervical spine had degenerative changes at multiple levels, particularly at level C6-C7.

21. Dr. Gallick testified for Plaintiff and offered his expert opinion on Plaintiff's left knee injury. Dr. Gallick was Plaintiff's treating orthopedist as to the left knee injury and saw Plaintiff on multiple occasions between December 2019 and October 2020. On Plaintiff's first visit, Dr. Gallick conducted a physical examination and determined there was meniscal damage to the knee. He testified he also reviewed the August 2017 MRI studies and MRI reports, which, in his assessment, confirmed Plaintiff had a torn medical meniscus of the left knee. He stated they also showed calcifications over the medial compartment but added this sign of disease was unrelated to the meniscal tear. Dr. Gallick testified he took a medical history from Plaintiff and some information about the May 2017 accident. He further testified that, according to the

5

medical records he reviewed, there was no indication Plaintiff had any injury or complaints of pain pertaining to his left knee before the accident.

22. On March 5, 2020, Dr. Gallick performed arthroscopic surgery to repair the torn medial meniscus on Plaintiff's left knee. He also found, and attempted to repair, an additional tear in the knee's lateral meniscus.

23. Dr. Gallick opined that Plaintiff's left knee injury was caused by the May 2017 accident. He based his opinion on his physical examination of Plaintiff in December 2019, his review of medical records and reports prepared by other healthcare providers who saw Plaintiff after the accident, his review of the August 2017 MRI studies of Plaintiff's left knee, and the history given by Plaintiff.

24. However, Dr. Gallick admitted in cross-examination that, although knowing details of how a vehicle accident occurs is important to a determination of causation, Plaintiff had not provided him with information about how exactly he might have injured his knee in the accident, nor did he ask Plaintiff to provide that information. Dr. Gallick admitted that, overall, he had limited knowledge of the accident itself. Moreover, he offered no opinion on the permanency of the left knee injury. Dr. Gallick also acknowledged Plaintiff's left knee displayed a pre-existing arthritic condition, which the arthroscopic surgery he performed was not intended to fix.

25. Defendant, in rebuttal, offered the opinion testimony of Dr. Robbins, an orthopedic surgeon. Dr. Robbins is a Fellow in the American Board of Orthopedic Surgeons. However, he has not treated patients since 2015. Rather, for the last decade he has

concentrated his work on "forensic orthopedics," that is, offering opinions in legal disputes. He testified he is mainly hired by defense attorneys to offer opinions.

26. Dr. Robbins conducted an independent medical examination of Plaintiff in connection with this lawsuit on June 6, 2019. He took a detailed medical history from Plaintiff. In forming his opinion, Dr. Robbins also reviewed discovery responses and medical records. Dr. Robbins testified that, in his opinion, Plaintiff's various claimed injuries were pre-existing and thus not caused by the May 2017 motor vehicle accident.

27. However, Plaintiff cast doubt on the conclusion reached by Dr. Robbins by questioning him as to the evidence, or lack thereof, of any prior injuries sustained by Plaintiff to his left knee. Dr. Robbins admitted that in his review of Plaintiff's medical records, he saw no mention of any knee problems prior to the May 2017 accident.

28. Plaintiff also pointed to weaknesses in the reports prepared by Dr. Robbins. As to Plaintiff's neck, Dr. Robbins relied principally on the neck contusion Plaintiff sustained in the February 2016 assault. Additionally, although Dr. Robbins opined that the condition of Plaintiff's left knee was due to degenerative disease, the medical records he reviewed reflected that various other doctors who had treated Plaintiff and/or reviewed his MRI studies did not note or mention that the left knee displayed damage consistent with degenerative disease but rather injuries consistent with trauma, that is, the torn meniscus.

29. Having considered and weighed the evidence on causation, the Court finds Plaintiff has failed to establish his claimed neck and back injuries were caused by the May 2017 accident. Plaintiff's only expert testimony that these injuries were caused by the

7

May 2017 accident consisted of Dr. Nehmer's opinion, which the Court finds weak and unpersuasive. Dr. Nehmer did not physically examine Plaintiff's back and neck; rather, his opinion was based solely on the MRIs and Plaintiff's self-reported symptoms. Dr. Nehmer also had very limited information about the accident and Plaintiff's medical history.

30. The Court finds that the lack of sufficient basis for Dr. Nehmer's opinion on causation renders his testimony on that score speculative and unpersuasive.

31. As to the knee injury, the Court finds Dr. Gallick's opinion on causation persuasive and credits it over the opinion given by Dr. Robbins. Dr. Gallick is an experienced board-certified orthopedic surgeon who continues to practice and in fact treated Plaintiff for his torn meniscus and performed the surgery to repair that damage. His opinion that the medial meniscus tear was caused by trauma, particularly the May 2017 accident, is consistent with his observations, treatment, Plaintiff's medical records, and the onset of Plaintiff's left knee pain after the accident. In contrast, Dr. Robbins's opinion that the torn meniscus was due to degenerative changes lacked support and was at odds with Plaintiff's medical history, the MRI studies, and reports interpreting those studies.

32. As to damages, the proofs submitted show Plaintiff sought medical treatment following the accident, prior to learning his employer carried workers' compensation insurance, and that the bills for that treatment were either paid out of pocket by

Plaintiff or are still owed by him to the provider. These bills, including the hospital visit on the day of the accident, treatment for the knee pain Plaintiff experienced, and the MRIs total $23,648.

33. Plaintiff also testified that, once he learned of his employer's workers compensation coverage, he sought treatment from Dr. Gallick for his knee injury, including surgery to repair the torn meniscus. Dr. Gallick submitted his bills to the workers' compensation carrier. The Court notes that the total workers' compensation lien is in evidence, and the medical benefits portion of that lien amounts to $32,009.39.

### III. CONCLUSIONS OF LAW

34. Based on the foregoing findings, and the factual findings made at the conclusion of liability phase of the trial, the Court sets forth the following conclusions of law.

35. The Complaint filed by Plaintiff asserts one claim against Defendants for common law negligence arising out of the May 3, 2017 motor vehicle accident.

36. To prevail in a negligence action under New Jersey law, a plaintiff must establish: (1) the defendant owed him a particular duty of care under the circumstances that gave rise to this action; (2) breach of that duty; (3) the defendant's breach of duty proximately caused the plaintiff to suffer some damage or harm; and (4) damages. *See Roberts v. Biancamano*, No. 09-6212, 2013 WL 775708, at *1 (D.N.J. Feb. 27, 2013); *Fernandes v. DAR Development Corp.*, 222 N.J. 390, 403-04 (2015).

37. The plaintiff bears the burden of establishing these elements by "a preponderance of the competent and credible evidence, before recovery from the defendant will be allowed." *Undercuffler v. United States*, No. 09-1152, 2011 WL 11051509, at *9

(D.N.J. Feb. 17, 2011); *Buckelew v. Grossboard*, 87 N.J. 512, 525 (1981). "'[T]he mere showing of an accident causing injuries is not sufficient from which to infer [a defendant's] negligence' … The plaintiff must introduce evidence which provides a reasonable basis for the conclusion that it was more likely than not that the negligent conduct of the defendant was a cause in fact of the injury." *Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 74 (3d Cir. 1996) (quoting *Hansen v. Eagle-Picher Lead Co.*, 8 N.J. 133, 139-40 (1951)).

38. The Court has already concluded that Plaintiff satisfied the first two elements, that is, that Defendants owed him a duty of care and breached it. The Court found Defendants were 85% at fault for the accident, and Plaintiff bore 15% of the responsibility. Accordingly, under New Jersey's Comparative Negligence Act, Plaintiff is permitted to recover damages for the injuries caused by Defendants' negligence. *See* N.J.S.A. 2A:15-5.1. However, the damages to which Plaintiff may be entitled are diminished by the percentage of negligence attributable to him. *Id.*

39. Regarding causation, the Court concludes Plaintiff has failed to demonstrate, by a preponderance of the evidence, that Defendants caused his claimed neck, back, and shoulder injuries, beyond his minor soft-tissue injuries and the general aches and discomfort suffered after the accident, as supported by Plaintiff's own testimony. Indeed, Plaintiff simply failed to establish by competent, credible expert testimony that the cervical and lumbar disc herniations and bulges were caused by the accident, that is, by Defendants' negligence.

40. However, Plaintiff did establish by a preponderance of the evidence that he sustained a torn medial meniscus of the left knee as a result of the accident. Thus, the Court concludes Defendants' negligence caused Plaintiff's left knee injury.

41. The Court then turns to Plaintiff's damages for this knee injury and for his soft tissue injuries. He has demonstrated out-of-pocket medical expenses in the amount of $23,648 for treatment of pain he experienced after the accident. Based in part on the medical benefits portion of the workers' compensation lien, the Court concludes Plaintiff's damages concerning treatment for the torn meniscus, including surgery provided by Dr. Gallick, amount to $32,009.39. In so finding, the Court emphasizes the very limited weight it gives to the workers' compensation lien evidence on the question of Plaintiff's damages, in general. Yet, in the absence of other evidence concerning the expenses associated with Dr. Gallick's treatment of Plaintiff's knee injury, the medical benefits paid by the carrier suffice as proof of, and sufficiently approximate, this portion of Plaintiff's damages. Finally, based on the totality of the evidence presented at trial, the Court values Plaintiff's pain and suffering—an inherently subjective calculation—in the amount of $20,000. Thus, the Court concludes that Plaintiff has proven he sustained a total of $75,657.39 in damages as a result of the May 3, 2017 accident.

42. Molding the damages to the parties' relative fault for the accident, in accordance with the New Jersey Comparative Negligence Act, the Court concludes that Plaintiff is entitled to 85% of the damages he has proven, for a total award of $64,308.78.

## IV. CONCLUSION

For the foregoing reasons, judgment will be entered against Defendants in the amount of $64,308.78. Pursuant to Federal Rule of Civil Procedure 58, Final Order and Judgment will be entered in a separate document.

Dated: September 30, 2025

                                               /s/ *André M. Espinosa*
                                               ANDRÉ M. ESPINOSA
                                               United States Magistrate Judge